```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

UNITED STATES OF AMERICA,        §
                                 §
                  Plaintiff,     §
                                 § Criminal No. 3:05-CR-255-D
VS.                              §
                                 §
JEFFREY THOMAS GEORGE,           §
                                 §
                  Defendant.     §
```

MEMORANDUM OPINION
AND ORDER

Defendant Jeffrey Thomas George ("George")—charged with multiple counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of unauthorized access to a protected computer with intent to defraud, in violation of 18 U.S.C. § 1030(a)(4)—moves to suppress evidence, including a computer hard drive and a manila folder containing documents, obtained during a warrantless search of the attic of the marital residence occupied exclusively by his estranged wife and conducted with her consent. Following an evidentiary hearing, and for the reasons that follow, the court denies the motion.[1]

---

[1] Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

I

George resided with his wife Velma Kay George ("Kay") and three children in Plano, Texas.[2] In early November 2004, George voluntarily moved out of the family residence, taking only a vehicle and a suitcase that contained his clothes. He left behind the remainder of his possessions. The residence had an attic, accessible from the garage, in which the couple stored personal possessions. The attic was accessible only through use of a ladder, and Kay never entered it.

George returned home for Thanksgiving and Christmas 2004 and stayed several days. While he was there, he went to the attic and retrieved holiday decorations. George vacated the residence again on New Years Day 2005, and he filed for divorce in February 2005. In late March 2005 Kay asked the husbands of some of her friends to return the decorations to the attic.

On March 17, 2005 a state-court associate judge signed agreed temporary orders that provided, in pertinent part, that Kay was to have "exclusive and private use and possession" of the family residence while the divorce was pending. Gov't Ex. 1 at 21; *see also id.* at 20 (assigning Kay responsibility for mortgage payments and associated escrow). Both parties were enjoined from

---

[2]The parties have relied on arguments that the court need not address given the basis for its decision. In reciting the background facts, the court has omitted some evidence that appears to have been offered solely or primarily as to issues that are not pertinent to the rationale for the court's ruling.

- 2 -

"[s]elling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of the other party, whether personalty or realty, and whether separate or community, except as specifically authorized by this order." *Id.* at 23.

George still had a key to the house, but in April 2005 Kay changed the locks after he entered the home while she was out of town, without her consent.

From March 2005 through February 2006 George obtained more of his personal belongings from the home, such as family albums, games, videos, a desk, and luggage. Kay typically placed them in a location where he could retrieve them when he came to the house to pick up the children. During their separation, George moved into a small apartment with little storage space.

In the summer of 2005 George requested items from the attic, including marionettes. He also asked for camping equipment for use in a camp out with his oldest son. Kay offered to let George retrieve the equipment from the attic because it was not a place she entered, but he never did. Over time, George, directly or through his attorney, requested the return of other personal property. Kay returned some but not all of the property requested.

In October 2005 the grand jury indicted George in this case. That same month, Kay contacted Federal Bureau of Investigation ("FBI") Special Agent Leon Lueken ("Agent Lueken"), who she knew was investigating George. She thought Agent Lueken might find

incriminating evidence in the attic in a brown briefcase that contained proof that George had fabricated university transcripts. With Kay's oral and written consent, *see* Gov't Ex. 2, Agent Lueken attempted to search the attic. Due to the tight space and the large volume of storage tubs and other materials, he was unable to locate or seize any evidence. Kay told Agent Lueken that the Christmas decorations stored in the attic would be removed in the next two weeks and that he could return then and resume his search.

After the decorations were removed in November, Kay again contacted Agent Lueken, inviting him to return and conduct the search. Again with her oral and written permission, *see* Gov't Ex. 3, and without any restrictions on what Kay authorized him to search, Agent Lueken searched the attic. This time, Agent Lueken observed among the personal possessions an unmarked blue tub that was closed with a lid but was unsealed and unlocked. He opened and searched this and other tubs. Among the items in the tub in question were some that he believed were evidence of a possible crime. These included a computer hard drive and a manila folder inside a computer manual. The folder contained papers with the name of a business called "Meridian" and the name "Bob Powers" (the alleged fictitious entity and person whom George is charged with creating to commit health care fraud). *See* Gov't Ex. 8. George moves to suppress the evidence seized during the second search. He acknowledges that "[b]oth parties agree that the evidence seized

from this storage bin is highly incriminating and critical to the government's case." D. Supp. Br. 1.

II

The Fourth Amendment protects individuals from unreasonable searches and seizures that intrude on reasonable expectations of privacy. "Warrantless searches are presumptively unreasonable." *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992) (citing *Horton v. California*, 496 U.S. 128 (1990)). "Valid consent to a search is a well-established exception to the normal requirement that law enforcement officers must have a warrant grounded in probable cause before conducting a search." *United States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "In *United States v. Matlock*, the Supreme Court extended to third parties the ability to grant this consent when those third parties "'possess[ ] *common authority* over or other sufficient relationship to the premises or effects sought to be inspected.'" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).[3]

Here, the government contends that George lacks standing to

---

[3]George cites the Supreme Court's recent decision in *Georgia v. Randolph*, ___ U.S. ___, 126 S.Ct. 1515 (2006), contending that "the Fourth Amendment should prohibit the police from gaining consent through a third party when the individual whose privacy is being invaded is [accessible] to give consent." D. Supp. Br. 6. In *Randolph* the Court held that a "physically present inhabitant's express refusal of consent to a police search is dispositive as to him." *Randolph*, 126 S.Ct. at 1528. *Randolph* is inapposite because George was not present during the search.

raise a Fourth Amendment challenge to the search and, alternatively, that the search was permissible based on Kay's consent. The court will decide the motion to suppress on the basis of whether Kay's consent authorized Agent Lueken to conduct the warrantless search and seizure.[4]

### III

#### A

Resolution of the question whether Kay gave Agent Lueken constitutionally sufficient consent to conduct a warrantless search of the attic and its contents turns on an assessment of George's reasonable expectation of privacy. This approach conforms with Fifth Circuit precedent in third-party consent cases.

> Viewing third-party consent through the prism of privacy interests enables us to approach the question of common authority by asking whether A sufficiently relinquished his expectation of privacy to B, i.e., allowed mutual or common use of the premises to the extent of joint access and control for most purposes, so that it is reasonably anticipated that B might expose the same privacy interest to others, even including law enforcement officers.

*Shelton*, 337 F.3d at 536.

---

[4]The court's reasoning would also impact the standing question were the court to address it, since standing is affected by whether a person has a reasonable expectation of privacy in the place searched or things seized. *See, e.g., United States v. Cardoza-Hinojosa*, 140 F.3d 610, 614 (5th Cir. 1998) (holding that defendant must have actual, subjective expectation of privacy with respect to place searched or things seized).

B

George concedes that Kay "had the authority to permit the FBI to enter her residence." D. Supp. Br. 3.[5] After George filed for divorce, the state court by March 17, 2005 agreed temporary orders awarded Kay "exclusive and private use and possession" of the residence. This occurred almost eight months before the search. Moreover, she had changed the locks, and he had no lawful authority or actual ability to enter the home without her consent. Her consent to search the house is even stronger than that approved by the Fifth Circuit in *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991) (rejecting challenge to third party written consent given by estranged wife to marital home where defendant-husband resided because estranged wife was granted exclusive use, possession, and control of premises and retained joint access).

George attempts, however, to focus his expectation of privacy more narrowly—on the storage tub and its contents—rather than more generally in the home over which Kay had exclusive and private

---

[5]George points out that his relationship with Kay was acrimonious at the time she consented to the search, and that she had a motive to implicate him in criminal acts. Kay's motive is not relevant, however, to the validity of her consent. Consent depends on two factors: whether it was voluntary and whether the third party had the ability to furnish valid consent. *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). The question whether consent was given is determined objectively. *See, e.g., United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003) (addressing first-party consent) ("'The question [of consent] is not to be determined on the basis of the subjective intentions of the consenting party . . . .'") (quoting Wayne R. LaFave, *Search and Seizure* § 8.1 (3d ed. 1996 & Supp. 2003)).

use and possession.  He contends that "[t]he consent by [Kay] was invalid because [she] lacked common authority over the personal and private boxes [that] were stored in the attic."  D. Br. 3.  He posits that "[t]he issue is whether [he] had a reasonable expectation of privacy, given all the circumstances in this case, in the storage tub in the attic containing solely his belongings."  D. Supp. Br. 3.  George maintains that the boxes (i.e., tubs), although not locked, were closed to public view, were placed in storage, away from a common-use room, pending dissolution of the marriage.  He emphasizes that Kay was prohibited by court order from "[s]elling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating" any of his property[6] and that, after March 2005, he had no access to the tub.

The court will assume *arguendo* that it should determine George's expectation of privacy at the micro level of the tub and its contents rather than at the macro level of the entire house or even the attic (although his expectations in these respects may inform his more specific expectations concerning the tub and its contents).  The court finds that George did not have a reasonable

---

[6]George's reliance on the restrictions in the temporary orders on alienating, tampering with, or destroying or transferring personal property in the home is misplaced if he intends to argue that such prohibitions restricted Kay's ability to consent to the search.  Kay did not engage in conduct prohibited by the temporary orders by merely consenting to a search of such property.  Once Agent Lueken conducted the search and had probable cause to believe the property was evidence of a crime, he then had lawful authority to seize it.

expectation that the tub and its contents would remain private from Kay. George knew that the attic was accessible to family friends who were assisting Kay with such chores as removing and returning Christmas decorations. He did not attempt to differentiate between tubs located in the attic that contained his own possessions and those that stored Kay's belongings. Some tubs contained personal items of both. The tub from which the evidence was seized was not hidden, such that George may have expected that others, including Kay, would not look in or access it. *Cf. United States v. Anderson*, 118 Fed. Appx. 805, 806 (5th Cir. 2004) (per curiam) (unpublished opinion) ("Based on [the defendant's] wife's status as co-owner and co-occupant of the marital home, it was reasonably foreseeable that she might enter and search the hidden compartment, despite [the defendant's] orders to the contrary . . . .") (citing *Shelton*, 337 F.3d at 536-38). It was neither locked nor sealed, and it closed using a snap-on lid.[7] Although Kay testified that she did not enter the attic due to its inaccessibility, the court finds that George did not place the tub there to render it inaccessible from Kay. This is corroborated by the fact that it

---

[7]George's reliance on *Holzhey v. United States*, 223 F.2d 823, 846 (5th Cir. 1955), is therefore misplaced. In *Holzhey* the Fifth Circuit reversed a conviction on the basis that evidence was obtained unconstitutionally where police, who secured consent to search a daughter's home, seized evidence from a locked cabinet belonging to the defendant-mother, who resided there and paid rent to her daughter. *Id.* at 846. In the present case, George did not reside at the residence, and the tub was not locked.

was stored in the same location with other tubs that contained Kay's personal belongings.

Furthermore, George left the tub in the attic for nearly one year without retrieving it.  Although his access to the residence was restricted *after* he filed for divorce, he had complete access to it before he filed the petition in March 2005.  He neither removed the tub or its content nor segregated, locked, sealed, or hid it.  Moreover, on several occasions following entry of the temporary orders, he requested and was granted the return of items of personal property.  But he never specifically requested the return of the tub in question or any of the items that Agent Lueken seized.  The items were left in his estranged wife's sole possession.[8]  In these circumstances, the court finds that George did not have a reasonable expectation of privacy from Kay.  In turn, he sufficiently relinquished his expectation of privacy by allowing mutual or common use of the tub and its contents to the extent of joint access and control for most purposes, so that he reasonably anticipated that Kay might expose the same privacy interest to others, including law enforcement officers.  Kay had authority to give valid consent to the search of the attic of her home, including the tub and its contents.  Her consent was

---

[8]The court agrees with George that the government did not establish its argument that George abandoned the storage tub and its contents.  The court concludes only that George did not have a reasonable expectation that the tub or its contents would remain private from Kay.

- 10 -

voluntary, and she had the ability to furnish valid consent.  The search of the attic of the marital residence and the seizure of evidence from the tub in question did not violate George's Fourth Amendment rights.

*   *   *

For the reasons stated, the court denies George's March 6, 2006 motion to suppress.

**SO ORDERED.**

April 18, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE